## SUPREME COURT.

### Eyre agt. Beebe, and others.

A *cause of action* in the nature of a *creditor's bill*, does not accrue until after the recovery of judgment and the return of execution unsatisfied, in the common law action. The *statute of limitations*, therefore, is not a bar to such an action until *six years* from the return of such execution.

Mere *hindrance and delay* is no objection to an *assignment for the benefit of creditors*. But if the *primary and controlling purpose* is to hinder and delay, then the statute is violated, and this may be the result even where the moral intention of the debtor is honest.

Eyre agt. Beebe.

Where debtors *stop payment* and close their business in consequence of a wide spread revulsion in trade, confident that with their assets they can pay all their debts, and do not then consider it necessary to make a general assignment for the benefit of their creditors; their *assignment of a portion of their assets* to a person for the avowed purpose of preserving it for their creditors at large, and to *prevent any unequal advantage to creditors in other states,* does not disclose any *fraudulent intent* in relation to their general assignment, executed nearly three months later.

It is not every kind of *interference* by an *assignor* with the property of the trust, that indicates a fraudulent intent at the execution of the assignment. Any suggestion offered by him which may be useful to the trustee, to the end that his property may go as far as possible in the payment of his debts and the satisfaction of his creditors, is the exercise of his moral interest in the disposition of his property which is justifiable.

Where a general assignment for the benefit of creditors provides " that the assignee shall retain, pay and disburse all the just and reasonable expenses, costs, charges and commissions of executing and carrying into effect the assignment, including a *just, reasonable and lawful compensation for his own services as such trustee:*" Such provision does not invalidate the assignment.

Where an assignment conveys to the assignee the partnership and the individual property of the assignors, with a direction to pay taxes, assessments, &c., to become due on the separate real property, such direction is not to be construed that such payments are to be made from the *partnership funds.*

A provision in such assignment that after payment of the partnership debts, the assignee shall pay all the *private and individual debts of each assignor*, is not an illegal provision. Even if it appeared in the assignment that each assignor was individually insolvent, and that the property assigned by each was *unequal in value,* and the debts of each *unequal in proportion,* still the presumption is that the assignee would do his duty and not pay the private debts of one partner with the property of the other, in the absence of any express provision to that effect in the assignment.

*New York Special Term, December,* 1864.

ACTION to set aside as fraudulent and void, an assignment for the benefit of creditors.

CRERKE, J.   I. Without asserting that the statute of limitations is or is not properly pleaded, it is sufficient to say that the cause of action in this case did not accrue until after the recovery of the judgment and the return of the execution in the common law action against the defendant Beebe.   The plaintiff could not commence this action until such proceedings were taken and consummated.   He had no right to commence it, and, therefore, no right of action

accrued.  Six years had not elapsed from the return of the execution in the former action before this was commenced.

II.  Did the conduct and acts of the defendant Beebe, before and at the time of the execution of the assignment, and subsequently to it, manifest beyond reasonable doubt an intent to hinder, delay or defraud their creditors ?  It is not sufficient to say that the execution of the assignment necessarily had the affect to hinder and delay them.  If mere hindrance and delay should avoid an instrument of this nature, then of course it could in no case whatever be upheld.  Every assignment in trust for the benefit of creditors operates to hinder or delay them in the enforcement of their claims.  But as the law recognizes and upholds such a disposition of a debtor's property, when it is in other respects without taint, it is palpable that the mere effect of hindrance or delay cannot invalidate them.  If indeed the primary and controlling purpose is to hinder or delay, then, undoubtedly, the statute is violated, and this will be the result, even when the moral intention of the debtor is honest, as when he thinks it would be better, that the property could be sold more advantageously for the interests of the creditors at a future time, and for this primary purpose executes an assignment.  If this is the purpose which induces him to make an assignment, it will be set aside, but if his primary and controlling purpose is to preserve his property for such a distribution of it among his creditors as the law sanctions, the assignment will be upheld, although it operates also to hinder or delay.  In the one case hindrance or delay is the main and primary purpose, in the other it is only an incidental effect.

On the 1st of September, 1857, the defendants Beebe, bullion brokers and bankers, stopped payment and closed their doors in consequence of the revulsion which so disastrously and widely followed the unexpected failure of the Ohio Life and Trust Company.  But although they stopped 'payment for the time, they were confident that they had

an abundance of assets to pay all their debts, and it appears to me they had reasonable ground for this belief. They therefore did not consider it necessary at that time to make a general assignment in trust, for the benefit of their creditors. But apprehensive that creditors in another state would levy attachments on their Trevorton coal stock, on the ground of non-residence, they assigned it on the 5th of September, 1857, to Mr. Colgate. They testify that their object in doing this was to preserve this portion of their property for their creditors at large, and to prevent any unequal advantage to creditors in other states. Whatever may be the legal effect of such an instrument as that, I cannot see that it discloses any fraudulent intent in relation to the general assignment, which was executed nearly three months later, on the 24th November, 1857. Indeed, if I can believe the witnesses, it had no reference whatever to the latter instrument, as in the beginning of September, I repeat, they had sanguine hopes of satisfying their creditors, without resorting to a general assignment. In like manner the sale of their bullion and the execution of the lease of their premises in Wall street, were made under the influence of the same hopes. Neither act was done in contemplation of making a general assignment, and, therefore, neither can shed any light on the intention by which they were guided in executing the latter instrument. In accordance with the hopes which they entertained of satisfying their creditors, without resorting to a general assignment, they received the $50,000 from Trevor and Colgate, and as fraud is not to be presumed, and as there is not a particle of proof showing an improper appropriation of the money, it is right to suppose that they continued to appropriate it to the payment of their debts, until after the lapse of nearly two months, they found that numerous dealers who had borrowed money to a large amount from them, over $700,000 on call, were utterly insolvent, and they had no longer any hope of paying all their creditors

the full amount of their claims. They then resolved to make the general assignment, and handed over to their assignee $8,000, the residue of the $50,000 left in their hands. The other acts previous to the 26th November, 1857, are not, in my opinion, indicative of any fraudulent intent relative to the assignment executed upon that day, nor can I find from anything said or done by the assignors at the time of its execution or subsequently to it, indicative of such an intent. I see no proof, but on the contrary, a positive denial that they illegally interfered with the property after the assignment. Even if the printed circular which was produced before me at the trial was authenticated, and the connection of the assignors with it clearly proved, this would not show such an interference as would indicate a fraudulent intent at the execution of the assignment. Indeed, it cannot be justly said that every kind of interference by an assignor with the property of the trust has any such effect. Every insolvent debtor has at least a moral interest in the advantageous disposition of the property, in order that it may go as far as possible in the payment of his debts and the satisfaction of his creditors, and, therefore, any suggestion offered by him which may be useful to the trustee, and beneficial to the creditors, so far from showing that he intended by the assignment to defraud his creditors, indicates that he was actuated by good motives from the beginning, if we can at all ascertain a past intent by subsequent conduct. Undoubtedly an actual and continued change of possession of the assigned property is essential to show the good faith of the parties to the instrument, and if the assignors in the present case retained possession of the great bulk of the property, converted it into cash, continued to administer the business, controlled its management, and if the assignee as in the case of *Wilson* agt. *Ferguson* (10 *How*. 175), was a mere cypher, a fraudulent intent would have been inevitably proved. In the case under consideration, however, the

assignee did take possession, and continued in possession with a few trifling exceptions, of the assigned property. He was a veritable custodian and disposer of it; he alone managed and controlled it, and he alone communicated with the creditors in relation to it. The assignee Colgate, accounts satisfactorily why some small portion of the individual property of the assignors was not retained in his actual physical possession. A circumstance of this kind is not sufficient of itself to invalidate the assignment, particularly after the lapse of five years, during which time a considerable proportion of the trust has been in a state of liquidation, and many dividends paid. If this is the only evidence of bad faith, it should not have the effect of counteracting indubitable evidence of good faith. It is affirmed by the plaintiff's counsel, that the assignors designed by executing the special assignment and the lease of these premises in Wall street, to coerce creditors into a compromise. I cannot discover any evidence of such a design, or any attempt to put it in execution, either before or after the execution of the general assignment. As to the assertion that the assignee fails to account for $137,000 of the proceeds of the assigned property in this action, he is not required to account for any portion of it except in a very general way, and no defalcation has been shown to affect the question of good faith in making the assignment.

III. If there are no extrinsic causes to authorize me to set aside this assignment, the next inquiry is, has it intrinsic defects which render it null and void? It is alleged that it provides for the assignee a greater compensation than the law allows. It provides " that the assignee shall retain, pay and disburse all the just and reasonable expenses, costs, charges and commissions of executing and carrying into effect the assignment, including a just, reasonable and lawful compensation for his own services as such trustee."

It would be an overstrained construction, to infer from this provision that it authorizes the assignee to retain or

Eyre agt. Beebe.

pay any one for services rendered to the trust, any more than the law strictly allows. If he should pay any more to others he will do so in his own wrong, and will be made liable for the amount in the accounting, and in the same' accounting he will be debited for any amount he has retained for his own compensation, beyond the commission stated in the statute. This provision in the assignment allows him nothing more than to retain a reasonable compensation for his own services and for the services of others, all just and reasonable expenses, costs, charges and commissions. To suppose more than this would be presuming illegality in a provision perfectly susceptible of a legal intendment. The assignment authorizes and directs the assignee to pay all costs, taxes and assessments due or to become due on the real property conveyed, until the same shall be disposed of. The assignors convey not only their joint real and personal property, but each also conveys his separate property. It is contended that the authority to pay rents, taxes and assessments on the separate real property, authorizes the assignor to pay them out of the partnership funds. The language employed, perhaps, is not as direct and precise as it ought always to be in legal instruments. But like the provision relative to the compensation of the trustee, it does not necessarily import an unlawful meaning. It nowhere expressly authorizes the trustee to pay the rents, taxes and assessments on the separate property of either assignor out of the partnership funds, and there is no reason to imply an authority so manifestly illegal. There is no necessity that he should resort to the joint fund to pay these amounts. The charges upon each separate property must be kept down by the rents and profits accruing from it; it is to be supposed that these are at least capable of doing this, and in the accounting, the trustee will have to to account separately for what he has received out of the separate property, and what out of the partnership property. And if by any ambiguity in the instrument, he

has been induced to pay individual debts with parthership
property, he will be compelled either to rectify his account
or make good the deficiency in his account of the partner-
ship receipts and expenses.  The possibility of a mistake
or misapprehension of the trustee will not warrant the total
abrogation of the instrument.

The assignment provides that after the payment of the
partnership debts, the trustee shall pay all the private and
individual debts of each assignor.  It is contended that
this is an illegal provision, and that it is illegal as against
the copartnership creditors.  It is certainly not intended
to affect them injuriously.  Not only is the individual pro-
perty of each copartner, in common with the copartnership
property, assigned to pay copartnership debts, but it is
expressly directed that no individual debts shall be paid
until all the copartnership debts are paid in full.  It is con-
tended that this provision renders the assignment null and
void, and I must say with JOHNSON, J., in *Turner* agt. *Jay-
cox* (40 *Barb.* 164), that this is a novel proposition.  At
least it was very novel to me until the counsel of the plain-
tiff directed my attention to some few cases maintaining a
similar proposition.  The furthest point in this direction
which anything like reliable authority had previously
reached, was that such a provision may avoid an instrument
when it appeared upon its face that each assignor was indi-
vidually insolvent, and that the property assigned by each
was unequal in value, and the debts of each unequal in
proportion.  This proposition is based on the ground that
such a provision is taking the property of one partner to
pay the debts of another who had less property or more
indebtedness.  But I think even here there is a fallacy, for
the assignee would not be bound to pay the debts of one
assignor with the property of the other, unless the assign-
ment contained an express provision to that effect.  It
would be presuming an illegal meaning to imply that the
trustee was authorized to do anything more than to pay

the debts of each assignor out of his individual property alone. I rely again on the fundamental principle that in the absence of express direction we are not to imply an illegal intent. At all events, in the case before us, it only appears on the face of the assignment that the partnership was involved, and there is nothing to show either on the face of the instrument or in the proof, that either of the partners was individually insolvent. In the latter indeed, there is some proof to show that each owed some individual debts, but nothing to show insolvency. The few authorities to which the counsel for the plaintiff refers me, however respectable, are more than outweighed by authority equally respectable, and at least equally obligatory on me. Even if the authorities on this subject were equally poised, I would have recourse to elementary principles and the deductions of reason. " It was a principle of the Roman law," says Chancellor KENT, " and it has been acknowledged in the equity jurisprudence of Spain, England and the United States, that partnership debts must be paid out of the partnership estate, and private and separate debts out of the private and separate estate of the individual partner " (3 *Kent's Com.* 64, 65, *marginal*).

By the same principles of equity jurisprudence, it is expressly affirmed that the separate creditors are entitled in equity to seek payment from the surplus of the joint property, after satisfaction of the joint debts. This is precisely the disposition of the surplus of which the plaintiff complains. The assignment provides nothing more or less than what the elementary principle to which I have referred expressly sanctions, and to which the individual creditors of the assignors in this case would be entitled, even if the provision to which the counsel so strenuously objects was not contained in the assignment. Surely that which the law expressly allows and directs, even without any positive direction in the instrument, cannot become nugatory merely because it is expressly recited in it. This

in my humble opinion, would be a very extraordinary method of legal reasoning. It would be quite as illogical as to say that a provision to pay partnership debts out of partnership property makes void an instrument, because it is a principle of equity jurisprudence that partnership debts shall be paid out of partnership property. Having a priority in equity, it is wrong to make any disposition of the partnership property to secure and effectuate that priority.

My conclusions of fact are : 1st. Six years have not elapsed from the time the right of action in this case accrued until its commencement. 2d. That the parties to the assignment in trust executed on the 26th November, 1857, did not intend thereby to hinder, delay or defraud the creditors of the assignors.

My conclusions of law are : 1st. That this action is not barred by the statute limiting the time of commencing civil actions. 2d. That the said assignment contains no provisions affecting the validity thereof on its face. 3d. That the same is a valid instrument; and 4th. That the complaint should be dismissed, and judgment given for the defendants, with costs.